The **JAY V. ZIMMERMAN COMPANY,**
a Corporation, Plaintiff,

v.

**GENERAL MILLS, INC.,** a Corporation,
**Defendant.**

No. 70C268(2).

United States District Court,
E. D. Missouri,
E. D.

May 7, 1971.

**1200**

Susman, Stern, Agatstein & Heifetz, St. Louis, Mo., for plaintiff.

Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

This removed action was brought to recover $16,400 allegedly due under a contract. Defendant counterclaimed for $70,892.79 for alleged breach of the same contract.

Plaintiff, a Missouri corporation, is engaged in the business of designing, fabricating, and selling various novelty items, including "inpack premiums" or novelties which are inserted in breakfast cereals for advertising purposes. Defendant, a Delaware corporation, is engaged, inter alia, in the business of manufacturing and selling breakfast cereals.

In April, 1969, Jay V. Zimmerman, the president of plaintiff, demonstrated to Thomas R. Nelles, defendant's Assistant Promotion Supervisor, a miniature plastic dune buggy concept for possible use as an inpack premium in one of defendant's breakfast cereals. Nelles expressed interest, having in mind using the dune buggy in defendant's cereal known as "Clackers." Thereafter, on May 13, 1969, Zimmerman presented a promotional brochure to Nelles, in which, because of his concern that plaintiff might have difficulty in meeting defendant's proposed delivery schedule, he stated that a "(s)econd set of molds will be made if the lead time for delivery to your packing plant is insufficient."

On May 27, 1969, Nelles verbally gave Zimmerman defendant's order for two designs of dune buggies. The following day Zimmerman confirmed this order in writing. Therein, plaintiff stated in part:

"Re——: Confirming Verbal Order on DUNE BUGGY as In-Pack Premium

Dear Tom,

This acknowledges and confirms the verbal order given us by you yesterday on the Dune Buggy, as follows——:

1. DESIGNS—to be an assortment of TWO styles.

2. SPECIFICATIONS—per our presentation to you, dated May 9, 1969.

3. MOLDS—to meet your weekly requirements, two 24-cavity molds will be engineered.

4. ASSORTMENT—each mold will produce one of the two styles, in three assorted colors, for a total of six colors.

5. QUANTITY—3,600,000.

6. TARGET DATE—at your West Chicago packing plant the week of September 2.

7. WEEKLY REQUIREMENTS— 600,000 minimum.

\* \* \* \* \* \*

Unless some unforeseen catastrophic situation come us (sic), we are confident we will be in production the week of August 25th.

This tight schedule is predicated on working overtime and paying incen-

tives to expedite all phases of the mold making and make ready.

\*     \*     \*     \*     \*     \*

With two molds, our weekly production will be in excess of 660,000. Once the flow to West Chicago has been started, common carriers can be used on a daily basis.

*Regarding the revised, lower costs—*:

1. We are quoting on the finished units, delivered to Per Pak (via Common Carrier), with the *one* mold and design amortized,

   \*   \*   \*

   *Initial Order of 3,600,000*
   *—$26.30 M*

2. The additional 24-cavity mold, the second model, all phases of this and the first mold produced on a 'crash' basis, *including* the upcharge of the first mold, will cost —$16,400."

After discussion with defendant on June 4, 1968, plaintiff ordered two molds from Designs for Tomorrow, Inc., a subcontractor· which agreed to furnish the first operational mold to plaintiff on August 22 and the second mold one week later. On June 5, defendant gave plaintiff written authorization to proceed with the tooling for the contract. Thereafter, on June 24, 1969, defendant issued its "Premium Purchase Order" based on the previous verbal agreement and plaintiff's confirmation, with slight modifications. This premium purchase order is referred to in the pleadings and briefs of both parties as the contract. Therein, defendant ordered 3,600,000 "Dune Buggy" inpack premiums at $26.30 per thousand, the price to include the amortization of one 24-cavity mold.

The purchase order provided for an additional payment by defendant of $16,400, the "cost of second 24 cavity mold required to meet our tight timing schedule," as well as for the cost of a prototype development in the amount of $1,220.

The mold used for the production of the dune buggies consisted of a "frame" (a metal base and top) into which were inserted 48 "cavities" or "berrylliums" (24 male and 24 female) made from steel castings known as "hobs." When operational, the mold was placed into an injection molding press and molten plastic was injected into the mold thereby producing 24 plastic dune buggies, 12 of each design, with each operation or "shot." The 24 dune buggies were connected by plastic "gates" and "runners" which required manual detachment or "degating."

At issue on plaintiff's claim is defendant's liability for the cost of the second mold, all other agreed payments having been made. Initially, plaintiff and Injex, Inc., plaintiff's injection molding subcontractor, had anticipated a production rate of 120 cycles or 2,880 dune buggies per hour, but within a week after the first mold was operational, production was stepped up to 180 cycles or 4,320 dune buggies per hour, so that plaintiff was actually able to produce 100,000 dune buggies per 24 hour day from the first mold alone. However, plaintiff did not notify defendant of the production rate it was able to achieve by use of the first mold until October 29, 1969, which was only 6 days before production was completed.

In the meantime, on September 22, 1969, Nelles had telephoned plaintiff inquiring as to the status of the second 24-cavity mold. Two days later he was informed that the mold was three-quarters completed, all the parts for the mold having been received. He was told that if work on the mold was then stopped, about $4,100 in labor costs could be saved, and to notify plaintiff by September 26th if defendant wanted the work stopped. At that time the first mold was not fully operational and no production deliveries had been made. In view of the foregoing, defendant may not be held to have waived its right to deny liability for the cost of the second mold by reason of Nelles' failure to direct that work on the mold be "stopped." This is particularly true in view of the further fact that no second mold (not even the

20 cavity mold which plaintiff unilaterally decided was preferable to the 24 cavity mold agreed upon) was either completed or operational until after the dune buggies had been produced. We hold that plaintiff is not entitled to the sum of $16,400 the agreed cost of a second 24 cavity mold "required to meet (defendant's) tight timing schedule."

That time was of the essence of the contract is evident not only from the specific provisions thereof relating to the time of delivery but also by reason of the very fact that defendant agreed to pay the additional sum of $16,400 for a second mold in order to make certain the dune buggies would be timely delivered. In effect, plaintiff agreed to meet defendant's "tight timing schedule" in consideration of defendant's agreement to pay the additional sum of $16,400 for a second mold, the existence of which was represented as necessary to insure performance by plaintiff. Defendant would not have agreed to make that payment but for plaintiff's representation that defendant's "tight timing schedule" could and would be met provided two operational molds were available for use. Since the agreed price for the dune buggies included the amortization of the cost to plaintiff of the first 24-cavity mold, the only one used, it would make no sense from defendant's point of view to pay for an additional mold except for the purpose of assuring that the "tight timing schedule" would be met.

■ This does not mean that defendant should be relieved of liability for the cost of a second mold simply because the first mold, when finally operational, in fact produced dune buggies at the unexpectedly high rate of 600,000 per week. Defendant does not so contend. Had plaintiff actually met defendant's "tight timing schedule" with the use of the first mold alone defendant would nevertheless have been obligated to pay for a stand-by second 24-cavity mold had one been completed and operational during the production period. However, due to no fault of defendant, the "tight timing schedule" was not met by a wide margin. Nor was a second 24-cavity mold completed and operational and available for use, if necessary, during the actual production period.

We are not impressed with plaintiff's argument that had it taken the time necessary to complete a second mold, production on the first mold would have been further delayed. If so, plaintiff may not profit from its own default. Once the "tight timing schedule" was not met by plaintiff, the only basis upon which defendant had agreed to pay for the cost of a second mold no longer existed.

Under the facts, there was a failure of consideration. The very matter for which defendant had bargained and upon which its agreement to pay $16,400 was conditioned completely failed. Plaintiff may not insist that defendant pay for something it did not get. In arriving at this conclusion we agree with plaintiff's contention that the contract "was not a separate contract for the fabrication of molds and another for the delivery of the dune buggies." See Rexite Casting Co. v. Midwest Mower Corp., Mo.App., 267 S.W.2d 327. Obviously, neither plaintiff nor defendant would have contracted for the second mold but for the relationship of that mold to the primary object of the contract, the production and delivery of the dune buggies on *schedule*. Paraphrasing *Rexite*, defendant's obligation to pay for the fabrication of the mold "was bound up with and geared to the [timely] production" of the dune buggies. Inasmuch as the agreement to pay for a second mold was only an incident to plaintiff's agreement to timely deliver the dune buggies, the second mold was completely meaningless to defendant absent such timely delivery or the availability of the second mold for use, if necessary, during the production period. Cf. Public Finance Corp. of Kansas City, Mo., No. 1 v. Shemwell, Mo. App., 345 S.W.2d 494.

Consequently, plaintiff's breach of the indivisible contract in respect to the timely delivery of the dune buggies precludes plaintiff from recovering for the

cost of a second mold which was never completed and the use of which, even if ultimately operational, could not possibly have enabled plaintiff to meet defendant's "tight timing schedule." "A party to a contract cannot claim its benefits where he is the first to violate it." *Rexite*, supra, 267 S.W.2d l.c. 333. Under any view of the facts it would be injust to permit plaintiff to recover the cost of a second mold.

■ We have found, in ruling plaintiff's claim, that plaintiff breached the contract in a substantial manner precluding it from recovering the cost of a second mold. The counterclaim seeks damages as a result of the late delivery of the dune buggies. Plaintiff urges that the delay was beyond its control and therefore its failure to timely deliver should be excused.

We do not agree. In its self-serving letter of November 28, 1969, plaintiff made clear that before agreeing to the "tight timing schedule" insisted upon by defendant, it had obtained the assurance of its subcontractor that the schedule would be met. Yet (quoting from that letter), "(f)or any one of many reasons given (to plaintiff by one of its subcontractors), including 'unauthorized extension of vacations,' insufficient working staff, etc., [the subcontractor] instead of being a week late, was over five weeks late." We see no reason to penalize defendant for delays which were not only legally foreseeable but against which plaintiff could have protected itself by appropriate covenants in its subcontracts.[1]

■ A further contention of plaintiff is that defendant was responsible for a portion of the delay in that it required a test production mold to be made before the first 24-cavity mold was completed. This contention is not supported by the credible evidence. In our opinion the test mold was made at plaintiff's instance and for plaintiff's benefit in expediting completion of the first mold in a workmanlike manner. And the fact that plaintiff was able to produce a relatively substantial number of dune buggies with the use of the test mold in order to build up some inventory while waiting for the larger mold to start production does not absolve plaintiff from the consequences of its delay.

■ Plaintiff also urges that defendant waived the requirement of prompt delivery. We find against plaintiff on this issue. The rule followed by the Missouri courts is that a purchaser who accepts late delivery does not thereby, as a matter of law, waive his right to recover damages which have resulted from the delay. See Redlands Orange Growers Ass'n v. Gorman, 161 Mo. 203, 61 S. W. 820. That defendant accepted the dune buggies in spite of plaintiff's breach of contract does not, under the facts of this case constitute a waiver.[2] The case of Pasquel v. Owens, 8 Cir., 186 F.2d 263, relied on by plaintiff, does not involve comparable facts.

■ We find as a fact that by accepting late delivery of the dune buggies defendant did not intend to and did not waive its right to damages. Under the facts of this case, all that defendant waived by accepting the dune buggies was its right to rescind the contract by reason of plaintiff's breach.

This brings us to the question of whether the Uniform Commercial Code of Missouri, and in particular Section 400.2–607(3), bars defendant from recovering damages as plaintiff insists.[3]

---

1. Nor is plaintiff to be excused simply because in its correspondence it refers to "target dates." Under the contract, plaintiff was required to meet a specified delivery schedule, not merely attempt to meet a "target date."

2. Although Nelles expressed willingness to accept a modified delivery schedule as outlined in his letter of August 18, 1969, he specifically stated that "it is *imperative* that we stay on this schedule." Zimmerman's reply of August 20th rejected this modified schedule, leaving the situation as it was.

3. The parties have stipulated that Missouri law applies to all facets of the case.

This statute provides in substance that where a tender has been accepted, the buyer must, within "a reasonable time" after the breach has been discovered or should have been discovered, notify the seller of the breach "or be barred from any remedy."

■ The statute refers to a breach which is discovered or discoverable only *after* acceptance of tender of the goods. The Missouri courts have not yet construed this section. However, in construing statutes generally, the Missouri courts act on the presumption that the Legislature never intends to enact an absurd law (City of Joplin v. Joplin Water Works Company, Mo., 386 S.W.2d 369, 373; State ex rel. American Mfg. Co. v. Koeln, 278 Mo. 28, 211 S.W. 31, 33) or to intend to require the performance of a needless and useless act. Gross v. Merchants-Produce Bank, Mo. App., 390 S.W.2d 591, 597.

In the present, as in any case involving late delivery, both the seller and the buyer are necessarily fully aware *prior* to tender that the seller's contract obligation to timely deliver has not been complied with. It would be an unreasonable, if not absurd, construction of the statute to require a renewed notice of breach *after* acceptance of the goods under the facts here involved. A party has notice of a fact when he has actual knowledge of it. Section 400.1–201(25) of the Uniform Commercial Code. The purpose of a notice in the context of this section (Cf. the definition of "notice" in Section 400.1–201(26)) is to *inform* the seller of matters which would not normally come to the buyer's attention until *after* the goods came into his possession. The legislative intent was to make provision with respect to the effect of acceptance of allegedly defective or inferior goods or those allegedly not meeting warranted standards of quality. In that situation it is reasonable to require the buyer to inform the seller of the existence of a possible factual dispute relating to matters of which the buyer presumably was not aware prior to his acceptance of a tender of the goods.

■ If perchance the statute should be construed to require a useless notice of a breach which is known to both parties prior to tender, we find under the facts that notice of breach sufficient to comply with the statute was given by defendant within a "reasonable time" after acceptance of the tender as well as prior thereto. In his letter of November 13, 1969, Nelles explicitly stated that plaintiff had failed to achieve its obligation to meet defendant's tight timing schedule "by wide margin." This language clearly "informs" plaintiff of the fact of its breach as to time of delivery, and by giving such information defendant has met the only burden the statute places on a buyer who has accepted a tender. He is not required to give notice of breach in any particular manner or form nor is he required to assert an intention to make a claim for damages or to pursue any other available remedy. In view of the actual knowledge of the seller concerning its untimely deliveries, the notice of breach in defendant's November 13, 1969 letter was given within a "reasonable time" after acceptance of the dune buggies. We are confirmed in this view by the further fact that numerous telephone discussions, beginning at least as early as mid-August and continuing through November, 1969, were had relating to plaintiff's inability to meet defendant's "tight timing schedule," and that in the course of these discussions, plaintiff was "informed" of its breach of contract. A verbal notice of breach is sufficient to meet the requirements of Section 400.2–607(3). When the Legislature intended that a notice be given in writing, it carefully and explicitly so provided. Cf. Section 400.2–607(5) (a) and (b).

Having found a breach of contract for which plaintiff is liable, the remaining issue is that of damages. Plaintiff was aware that defendant intended to use the dune buggies as an inpack premium in promoting the sale of its Clackers cereal and that the "tight timing schedule" was for the purpose of assuring

that the promotion would be made at the particular period of the year which in the judgment of the defendant was best suited to overcome consumer sales resistance. Relying on plaintiff's agreement to conform to the "tight timing schedule," defendant purchased cereal cartons on which were imprinted dune buggy advertisements and in addition contracted and paid for the preparation of TV commercials. When it became obvious that the "tight timing schedule" could not and would not be met, defendant was forced to change its plans for the use of the dune buggies.

█ In order to avoid a vacuum during the period in which the dune buggies were to be used as premiums, defendant hurriedly arranged for another premium which was far from satisfactory as a substitute for the dune buggies. Because of the shortness of time, defendant was required to ship the substitute premium by air-freight at a cost of $2,831.98 and was also required to pay the seller the cost of overtime labor to produce the substitute premium, at an additional cost to defendant of $320. These two expenses totaling $3,151.98 would not have been incurred but for plaintiff's breach of contract, and we find that they constitute "incidental damages" in connection with effecting cover, incident to the breach, within the meaning of Section 400.2–715 of the Uniform Commercial Code of Missouri. These damages would have been sustained even if the dune buggies had been rejected.

█ As for the other damages sought, the evidence shows that in April, 1970, defendant destroyed the dune buggy Clackers cartons at a net loss to defendant of $31,498.04. Defendant seeks to impose liability upon plaintiff for the amount of this loss, its theory being that the specially imprinted Clackers cartons were time coded so that they became worthless for later use.

We hold that defendant is not entitled to recover this item of damages. We find that the cartons were not actually time coded and that they could have been used for a Clackers dune buggy promotion at any time after the dune buggies were accepted had defendant desired to do so. That defendant was impressed with the value of the dune buggies as an inpack premium and for that reason accepted the late deliveries admits of no doubt. We are convinced, however, that defendant's decision not to use the dune buggies to advertise its Clackers cereal was due to its reasonable belief that these premiums could more profitably be used to promote another of its cereals in view of the rapidly declining sales of Clackers commencing long prior to the agreed dates of delivery.

The Clackers cartons became obsolescent and were ultimately destroyed solely because of defendant's change in promotion plans and not because of plaintiff's default in making timely deliveries. For the same reason we find that the defendant is not entitled to recover the cost of the Clackers' dune buggy commercials, advertising which it could have used had it not decided to abandon the use of dune buggies in promoting Clackers. Defendant presented no substantial evidence to support an award for loss of profits and has now waived any such claim.

It follows from the foregoing that defendant is entitled to recover only the sum of $3,151.98 on its counterclaim.

The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in accordance herewith.