**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AQUALON COMPANY,
Plaintiff-Appellant,

v.

MAC EQUIPMENT, INCORPORATED,
Defendant & Third Party                    No. 97-1693
Plaintiff-Appellee,

and

C.W. NOFSINGER COMPANY,
Third Party Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-96-917-3)

Argued: March 5, 1998

Decided: July 8, 1998

Before MURNAGHAN, Circuit Judge, KEELEY,
United States District Judge for the
Northern District of West Virginia, sitting by designation, and
MOON, United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Keeley and Judge Moon joined.

_____

**COUNSEL**

**ARGUED:** Brewster Stone Rawls, BREWSTER S. RAWLS & ASSOCIATES, P.C., Richmond, Virginia, for Appellant. Earle Duncan Getchell, Jr., MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:** John B. Nicholson, BREWSTER S. RAWLS & ASSOCIATES, P.C., Richmond, Virginia, for Appellant. David H. Worrell, Jr., J. William Boland, M. Christine Klein, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Aqualon Company, a chemical manufacturer, asked MAC Equipment, Incorporated, to produce rotary valves, also called airlocks, for use in a pneumatic conveying system. The system was designed by C.W. Nofsinger Company to move a chemical, blended carboxymethyl cellulose. Before MAC was awarded a contract to produce the valves, it provided estimates of how much air its valves would leak. However, once the valves were actually constructed, they leaked much more than expected.

After almost a year of complaints and negotiations between Aqualon and MAC, it became apparent that the valves could not be made to leak any less. Aqualon modified its system design so that it would still be able to move the chemical despite the leakage. In the spring of 1993 Aqualon reissued a purchase order for the leaky valves; Aqualon accepted the valves in June; and Aqualon paid for them in full as of December 19, 1993. MAC did not conceal, and Aqualon knew, the valves' air leakage rate.

Three years thereafter Aqualon served MAC with a complaint for breach of contract and warranty. The district court granted summary judgment to MAC, holding that Aqualon had not given MAC notice within a reasonable time of its claim for breach. Aqualon appeals.

2

I.

We first address our jurisdiction to hear this case in federal court. Aqualon commenced the case in Virginia state court, but the parties being of diverse state citizenship and the required amount being at issue, MAC filed the necessary papers to remove it to federal district court. About an hour after doing so, MAC in state court filed a Notice of Removal and a Third Party Motion for Judgment against C.W. Nofsinger. Aqualon moved to remand the case back to state court but the district court denied Aqualon's motion and kept jurisdiction of the case.

Aqualon maintains that MAC's removal to federal court was improper and that the district court should have granted the motion to remand. Aqualon asserts that by filing a Third Party Motion for Judgment against C.W. Nofsinger in state court, MAC submitted to the jurisdiction of the state court and waived its right to remove to federal court.

The district court's decision that the defendant did not demonstrate an intent to waive its right to remove to federal court is a factual determination, to be reversed only if clearly erroneous. See Grubb v. Donegal Mut. Ins. Co., 935 F.2d 57, 59 (4th Cir. 1991). In Grubb, we held that "although a defendant may yet waive its 30-day right to removal [under 28 U.S.C. § 1446(b), after federal jurisdiction becomes appropriate] by demonstrating a `clear and unequivocal' intent to remain in state court, such a waiver should only be found in `extreme situations,'" 935 F.2d at 59. MAC, by contrast, had clearly previously indicated its desire to seek the federal forum.

Aqualon cites, in support of a finding of waiver, two district court cases, Baldwin v. Perdue, Inc., 451 F. Supp. 373 (E.D. Va. 1978), and Sood v. Advanced Computer Techniques Corp., 308 F. Supp. 239 (E.D. Va. 1969). In both cases, the defendants moved to remove to federal court after they filed permissive substantive defenses in state court (a cross-claim in Baldwin and counterclaims in Sood). The district courts found waiver in both cases and granted motions to remand. See Baldwin, 451 F. Supp. at 375-76; Sood, 308 F. Supp. at 242.

3

A defendant may waive the right to remove by taking some such substantial defensive action in the state court before petitioning for removal. However, waiver by conduct does not exist when removal, as here, precedes any state court action. Federal jurisdiction attached as soon as MAC filed a Notice of Removal in Federal Court, an hour before MAC filed any pleadings in state court. See Berberian v. Gibney, 514 F.2d 790, 792 (1st Cir. 1975); Burroughs v. Palumbo, 871 F. Supp. 870, 872 (E.D. Va. 1994). It could not waive a right that it had already exercised.

Furthermore, even if remand would have been proper, once an improperly removed case has proceeded to final judgment in federal court that judgment should not be disturbed so long as the federal court had jurisdiction over the claim at the time it rendered its decision. In Caterpillar Inc. v. Lewis, 117 S. Ct. 467 (1996), the Supreme Court held that "a district court's error in failing to remand a case improperly removed is not fatal to the ensuing adjudication if federal jurisdictional requirements are met at the time judgment is entered," id. at 471. "To wipe out the adjudication post-judgment, and return to state court a case now satisfying all federal jurisdictional requirements, would impose an exorbitant cost on our dual court system, a cost incompatible with the fair and unprotracted administration of justice." Id. at 477. The Fourth Circuit has recognized these "considerations of finality, efficiency, and economy," id. at 476, as well:

> Where a matter has proceeded to judgment on the merits and principles of federal jurisdiction and fairness to parties remain uncompromised, to disturb the judgment on the basis of a defect in the initial removal would be a waste of judicial resources. Although the interest in judicial economy is most pressing where an action has proceeded to trial, we feel that the same considerations are applicable to summary judgment.

Able v. Upjohn Co., 829 F.2d 1330, 1334 (4th Cir. 1987) (citation omitted), overruled on other grounds, Caterpillar, Inc., 117 S. Ct. at 475 n.11.

There is no dispute that diversity jurisdiction existed both at the time of removal and at the time summary judgment was granted for

4

MAC. And Aqualon has not argued that it was prejudiced in some way by the federal forum. We conclude that the district court properly exercised jurisdiction over this case.

II.

As this appeal arises from a grant of summary judgment, we view the facts in the light most favorable to the non-moving party, deciding matters of law de novo. See Halperin v. Abacus Technology Corp., 128 F.3d 191, 196 (4th Cir. 1997). Here the relevant facts are essentially agreed upon. Aqualon, after repeatedly stressing its right to reject nonconforming valves, reissued purchase orders for the valves knowing full well that they leaked more than MAC had estimated, accepted delivery and paid for the valves in full, all without notifying MAC that it found the transaction still troublesome. The first such notice Aqualon gave MAC that it intended to pursue a claim of breach was the complaint served on MAC three years after acceptance. The district court dismissed Aqualon's breach of contract and breach of warranty claims on the ground that such notice was not given within a reasonable time after acceptance, as section 2-607(3) of the Uniform Commercial Code requires.[1] We are asked to review the application of the U.C.C. section 2-607(3) as a matter of law.

Section 2-607(3) provides:

> (3) Where a tender has been accepted
>
>  (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . .

_____

[1] The purchase orders for the rotary airlock valves each contain a choice of law provision specifying that disputes over the items addressed therein shall be governed by Delaware law. The district court applied Delaware law to Aqualon's breach of contract and breach of warranty claims. Because Delaware (and Virginia, site of the Aqualon production facility) has adopted Uniform Commercial Code section 2-607(3) without modification, see Del. Code Ann. tit. 6, § 2-607; see also Va. Code Ann. § 8.2-607 (Michie), we refer to the U.C.C. directly instead of any provision of state law.

5

U.C.C. § 2-607(3). The notice required by section 2-607(3) "need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." U.C.C. § 2-607, cmt. 4.

Aqualon makes four related arguments: 1) section 2-607(3) does not apply to the circumstance presented here; 2) Aqualon's pre-acceptance complaints that the valves leaked more than it had estimated constituted reasonable notice of the breach; 3) MAC's actual knowledge that the valves leaked more than MAC had estimated fulfilled the purposes of the U.C.C. notice requirement; and 4) Aqualon's serving MAC with a complaint three years after acceptance constituted notice within a reasonable time. We address each contention in turn.

A. U.C.C. Section 2-607(3) Does Apply

By its terms, U.C.C. section 2-607(3) applies to this case because this is a situation "[w]here a tender [of goods, i.e., the valves] has been accepted." Section 2-607(3) bars a breach of contract claim by a buyer, such as Aqualon, who has accepted the seller's, such as MAC's, tender of goods unless Aqualon gave MAC notice of the alleged breach within a reasonable time.

Section 2-607(3) is based on section 49 of the Uniform Sales Act. See U.C.C. § 2-607, cmt. (Prior Uniform Statutory Provision). Professor Williston, the author of the Uniform Sales Act, has explained that section 49 ameliorated the harsh rule that acceptance of a tender of goods acted as a release by the buyer of any claim that the goods did not conform to the contract. See 5 Williston on Contracts § 714 (3d ed. 1961). But the Uniform Sales Act did not go entirely to the other extreme by allowing the buyer to accept goods without objection and then assert claims for breach of contract at any time within the statute of limitations period. See id. Instead, the Act "allow[ed] the buyer to accept the offer without waiving any claims, provided the buyer gave the seller prompt notice of any claimed breach." Southeastern Steel Co. v. W.A. Hunt Constr. Co., 390 S.E.2d 475, 478 (Ct. App. S.C. 1990). Courts have held that the same understanding applies to section 2-607(3) of the U.C.C. See, e.g., id.; Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 971 (5th Cir. 1976).

6

Aqualon has argued that the U.C.C. provision does not apply to this case because MAC had actual knowledge that its valves were inadequate long before Aqualon's acceptance. Requiring further notice after acceptance would be pointless, Aqualon argues. In support, Aqualon cites Jay V. Zimmerman Co. v. General Mills, Inc., 327 F. Supp. 1198 (E.D. Mo. 1971). In Jay V. Zimmerman Co., the seller was unable to deliver the goods by the date specified in the contract. The seller clearly knew that it was in breach of the contract when it delivered the goods late, and the buyer did not formally notify the seller of its intent to sue for breach after accepting the late goods. The court found that section 2-607(3) did not apply in the situation where the seller had actual knowledge of the breach at the time of delivery, holding that "[i]t would be an unreasonable, if not absurd, construction of the statute to require a renewed notice of breach after acceptance of the goods" in those circumstances. Id. at 1204.

Both previous and subsequent cases have rejected the reasoning of Jay V. Zimmerman Co. Under the Uniform Sales Act predecessor to section 2-607(3) "it was irrelevant whether a seller had actual knowledge of a nonconforming tender. Instead, the critical question was whether the seller had been informed that the buyer considered him to be in breach." Eastern Air Lines, Inc., 532 F.2d at 972 (rejecting Jay V. Zimmerman Co.); see also 5 Williston on Contracts § 714, at 409-10 (3d ed. 1961) ("It might be urged that the seller needs no notice in case of delivery delayed beyond a date expressly fixed in the contract, for he must be aware that he is violating the provisions of the contract, but though he knows this he does not know whether the buyer is willing to accept deferred delivery as full satisfaction, and in any event the words of the Statute seem plain."). As the Southeastern Steel Co. court noted, Judge Learned Hand "eloquently disposed of this imaginative, but fallacious, argument," 390 S.E.2d at 480, that a seller's knowledge of a defective tender was sufficient notice of breach:

> The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice "of the breach" required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of

7

the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

American Mfg. Co. v. United States Shipping Bd. Emergency Fleet Corp., 7 F.2d 565, 566 (2d Cir. 1925); see also Oxford Boatyard Co. v. Warman, 192 F.2d 638, 639 (4th Cir. 1951) ("It is not enough that the defendant knew of the defect . . . since it did not know that plaintiff was claiming breach of warranty on that account.").

Aqualon responds to this argument by pointing out that Judge Hand was interpreting the predecessor to U.C.C. section 2-607(3). Aqualon admits that U.C.C. section 2-607(3) was patterned on the statute interpreted by Judge Hand, but claims that the U.C.C. provision was drafted "with an eye towards achieving less harsh results where the buyer is a `retail consumer.'"

But numerous courts have applied Judge Hand's reasoning to cases involving U.C.C. section 2-607(3). See, e.g., Standard Alliance Indus. v. Black Clawson Co., 587 F.2d 813, 825 (6th Cir. 1978); Eastern Air Lines, Inc., 532 F.2d at 972-73. The reasoning is persuasive, and it produces no "harsh results" in this case. Aqualon was required by section 2-607(3) to give formal notice to MAC, after accepting the valves, that it still found the transaction troublesome. Only then would MAC know not to assume a position of repose, but that it should attempt either to cure the defect, negotiate a settlement or prepare for litigation.

Aqualon cites Arcor, Inc. v. Textron, Inc., 960 F.2d 710 (7th Cir. 1992), for the proposition that we should reject the "cramped" construction of section 2-607(3) adopted by the district court in favor of a "more practical construction." In Arcor, Inc., Aqualon argues, the Seventh Circuit recognized that the notice requirement was fulfilled where the "seller has actual knowledge of the product's failure based on the seller's own observations." Id. at 715. Aqualon asserts that the Seventh Circuit has recognized that it would be absurd to require buyers to notify sellers of a breach of which they were already aware.

Arcor, Inc. is easily distinguishable from the instant case, however. The buyer in Arcor, Inc. notified the seller that the product would not

8

perform as required shortly <u>after</u> the buyer accepted it. During the following two years, the seller visited the buyer approximately thirty times on service calls, attempting to correct the problem with the machine. When these attempts were unsuccessful, the buyer sued for breach of warranties. <u>See id.</u> at 711.

The Seventh Circuit was right to hold that in that case the seller had actual knowledge of its breach and further notice would be pointless. The seller clearly knew that the buyer found the transaction "still troublesome." But that holding does not apply to the present situation, in which the buyer made no complaints after accepting the seller's tender. Here, after Aqualon accepted and paid in full, MAC had no way to know that Aqualon found the transaction "still troublesome."

MAC admits it knew when it delivered the valves that they leaked more than it had estimated, but it was not aware that Aqualon would consider this to be a "breach" of anything. Although it had estimated maximum leakage amounts before being awarded the contract, MAC had made it clear that any performance warranty would be contingent upon MAC's approval in writing of the final equipment-installation and convey-route line drawings. The drawings were never approved by MAC. MAC and Aqualon later discussed a specific performance guarantee that Aqualon was supposed to draft, but Aqualon never drafted one. Furthermore, after Aqualon's original purchase order was sent, MAC executed an Order Acknowledgment that expressly disclaimed both express and implied warranties. MAC did not know, therefore, that Aqualon would claim that the valves' excessive leakage rates constituted a breach of contract or breach of warranty.

B. <u>Aqualon's Pre-Acceptance Complaints Did Not Satisfy the Requirements of U.C.C. Section 2-607(3)</u>

Aqualon next argues that its complaints to MAC before the March, 1993, reissuance of the purchase order for the valves satisfied the requirements of section 2-607(3). Aqualon sent a letter to MAC on August 3, 1992, in which it asserted that the valve leakage rates were "outside the performance requirements of our purchase order" and that Aqualon "cannot accept valves that will not perform." That letter was followed by continuous correspondence "for the next six months regarding recommendations on how to correct and solutions to the

9

deficiency of the valves." During the six months Aqualon commissioned more tests of MAC's valves and tested the valves of one of MAC's competitors for a comparison. There is some evidence that no valve then on the market had low enough leakage rates to perform in the system which C.W. Nofsinger had designed. Aqualon was forced to redesign parts of its system. Aqualon again asserted its right to reject valves that did not meet its performance requirements in a letter of September 22, 1992. By March of 1993, Aqualon explains, both it and MAC knew that the excess leakage could not be remedied.

However, Aqualon's acceptance of the valves without comment after the six months of letters dissipated the effect of its earlier complaints. See Eastern Air Lines, Inc., 532 F.2d at 978. Knowing the leakage rates, Aqualon nevertheless reissued its purchase order for the valves in March of 1993 and amended it in April of 1993. In June of 1993 MAC's tender of the valves was accepted, and in December Aqualon paid for the valves in full. Finally, in the winter of 1993 Aqualon told MAC that its system was working well, and the only problem it mentioned was blower noise, which MAC fixed.

In short, MAC probably knew that Aqualon was not happy with the leakage rates, but it could reasonably have believed that Aqualon was satisfied with the valves. Because Aqualon did not inform MAC after accepting the tender that the transaction was " still troublesome," MAC had no way to know that there was any remaining problem to be cured, or any controversy to be negotiated about or settled, or any impending litigation with which to be concerned, after Aqualon reissued the purchase order for, accepted and paid for the valves. Without any post-acceptance notice otherwise, MAC deserved to be able to rely on the certainty of its contractual arrangement and to believe that a way had been found to make the valves satisfactory.

Aqualon argues that the above argument is "disingenuous" because "MAC was clearly aware, after working with Aqualon for over six months, that Aqualon had no choice but to accept the valves and make changes to their own system in order to make them work." MAC contests this assertion, but even if it is perfectly true, once Aqualon made those changes MAC could not be expected to know that Aqualon would still find the deal troublesome. MAC's knowledge that changes to the system were required and were costly did not

10

notify MAC that Aqualon would blame MAC as opposed to C.W. Nofsinger, who designed the system.

Aqualon further argues that to require post-acceptance notice is "unjust" because time pressure forced it to accept the valves built by MAC despite their inadequacy. This is irrelevant to the question whether MAC was given reasonable notice in which to try to cure the problem, settle the claim, or prepare for litigation. Aqualon asserts that "to find lack of notice because [Aqualon] chose to accept the valves despite deficiencies which were known by all parties, punishes Aqualon for attempting to minimize damages." But nothing prevented Aqualon from accepting the valves to minimize damages while also notifying MAC that it should prepare for future litigation.

Aqualon also argues that formally notifying MAC of the claim of breach was impractical because it would have interfered with the business relationship between the two companies. However, the desire to preserve a good business relationship does not justify Aqualon's springing this lawsuit on MAC without the reasonable notice required by the U.C.C. Furthermore, Aqualon's assertion that it did not formally complain because it wanted to preserve its business relationship undermines its claims that MAC had notice of the likelihood of litigation.

C. The Purposes of the Notice Requirement
        Were Not Met

Acknowledging that it gave no additional notice after it accepted the valves that the transaction was "still troublesome," Aqualon asserts that the purposes of the notice requirement were met by MAC's actual knowledge that its valves were inadequate. Aqualon argues that where those purposes have been satisfied, its failure to comply with the technical requirements of the U.C.C. should not bar it from litigating the case on the merits. See Prutch v. Ford Motor Co., 618 P.2d 657, 661 (Colo. 1980) (en banc ) ("When, as here, the purposes of the notice requirement have been fully served by actual notice, the notice provision should not operate as a technical procedural barrier to deny claimants the opportunity to litigate the case on the merits.").

11

Aqualon contends that three purposes of the notice requirement were met in this case. The three purposes that Aqualon identifies for the U.C.C.'s notice requirement are:

>      (1) to prevent surprise and allow the seller the opportunity to make recommendations on how to cure the nonconformance;

>      (2) to permit the seller the fair opportunity to investigate and prepare for litigation; and

>      (3) to open the way for normal settlement of claims through negotiation.

Aqualon, however, neglects to include a further purpose identified by the district court:

>      (4) to protect the seller from stale claims and provide certainty in contractual arrangements.

Cf. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 11-10, at 612-13 (4th ed. 1995) (listing these purposes, as well as the purpose of recognizing a general disbelief of tardy claims). Assuming, without deciding, that satisfaction of these four purposes would obviate the need to comply with the terms of the statute, Aqualon cannot demonstrate that the purposes were satisfied.

First, the notice requirement provides an opportunity for the seller to cure the defect. See, e.g., Hebron v. American Isuzu Motors, Inc., 60 F.3d 1095, 1099 n.2 (4th Cir. 1995). MAC knew in August of 1992 that its valves would leak far more than stated in its original proposal. Both MAC and Aqualon worked together for the next six months to try to modify Aqualon's system design to use those valves, because both parties knew that nothing more could be done to improve the performance of the valves. Because MAC had in excess of six months to effect a cure[2] and was unable to do so, Aqualon contends that the first purpose of the notice requirement was satisfied.

_____

[2] Aqualon unknowingly admits much by its repeated assertions that MAC had "full notice for over six months" that its valves were noncon-

12

Second, the notice requirement is intended to give the seller a fair chance to prepare for litigation, for example by gathering documents and taking depositions while the evidence is still available and memories are still fresh. See, e.g., Cole v. Keller Indus., 872 F. Supp. 1470, 1474 (E.D. Va. 1994), vacated on other grounds , 132 F.3d 1044, 1047-48 (4th Cir. 1998). Aqualon asserts that this purpose was fulfilled because MAC knew of the possibility of litigation by virtue of its knowledge that the system as originally designed did not work with the leaky valves. However, as explained above, the aforementioned knowledge demonstrates that MAC knew the facts, but not that MAC knew that Aqualon would consider these facts to constitute a breach of warranty. Aqualon's acceptance of and full payment for the valves without further complaint, knowing their leakage rates, communicated to MAC that the valves were acceptable.

Third, the notice requirement prompts negotiation and settlement of claims. See, e.g., Hebron, 60 F.3d at 1098-99. If MAC had been notified more promptly after Aqualon's acceptance of the valves that Aqualon intended to sue MAC (specifically, before Aqualon filed its complaint), it might have settled the underlying claim. Because MAC would not have had to undertake the expenses of litigation that arose when it had to respond to Aqualon's complaint, MAC would likely have offered more money in settlement of the claim. And because Aqualon would not yet have invested in litigation by paying lawyers to prepare and file the complaint, Aqualon would presumably have

_____

forming. Aqualon's six month figure presumably is measured from MAC's letter of August 3, 1992, acknowledging that the valves would not meet the estimated leakage values, to Aqualon's March 1993 reissuance of the purchase order. The important point is that Aqualon stops counting the time that MAC knew its valves were unacceptable at the date when Aqualon reissued the purchase order; Aqualon implicitly recognizes that MAC did not know its valves were still unacceptable after Aqualon reissued the purchase order.

If Aqualon truly believed MAC still knew its valves were unacceptable and might trigger a lawsuit after reissuance of the purchase order, Aqualon would have claimed that MAC had 10 months notice (until June 1993 when the valves were shipped), over a year's notice (until they were paid for in full), or more than 5 years notice (from the time of its letter until today) to try to cure the defect.

13

agreed to receive less money in settlement of its claim. In this way, earlier notice would have led to a greater chance of settlement. Aqualon's bare assertion that "MAC has suffered no detriment with respect to the options of settlement," just because settlement efforts were unsuccessful, is mistaken.

Finally, the notice requirement is intended to protect the seller from stale claims and provide certainty in contractual arrangements. See id. Aqualon argues that using a notice requirement to give peace of mind to a defendant and to protect against stale claims is inappropriate and unnecessary because that purpose is served by a statute of limitations. It is true that a state may decide to serve these policies through a strict statute of limitations. But a state may also choose to enact a notice requirement in addition to a longer statute of limitations. Such a two-part scheme preserves claims of which the defendant has not been notified for only a short period of time, but if the defendant has been notified, it preserves those claims for a longer period. The Delaware equivalent of U.C.C. section 2-607(3) combines with Delaware's statute of limitations to create just such a scheme. Because Aqualon made no complaints to MAC for three years after accepting the valves, MAC was entitled to assume a position of repose.

D. Aqualon's Delay of Three Years Was Not
        Notification Within a Reasonable Time

Finally, Aqualon argues that even if its pre-acceptance complaints did not serve to notify MAC that it found the transaction "still troublesome," Aqualon's service of a civil complaint on MAC approximately three years after accepting the valves was notification within a "reasonable time," satisfying U.C.C. section 2-607(3).[3] The district

_____

[3] MAC urges that we should follow the "majority" of courts to address the issue and hold that notice-via-lawsuit is insufficient as a matter of law, citing cases such as Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co., 537 N.E.2d 624, 638 (Ohio 1989), and Lynx, Inc. v. Ordnance Prods., Inc., 327 A.2d 502, 514 (Md. 1974). But MAC's assertion that this is the "majority" position recognizes that courts in other jurisdictions disagree. In fact, the Chemtrol Adhesives, Inc. court declined to adopt such a per se rule. See 537 N.E.2d at 638. We decline to resolve this issue of first impression under Delaware law.

14

court found that such a delay was unreasonable, relying on our statement in Hebron that "[i]n the circumstances of this case, we hold that a two-year delay in giving notice under [the Virginia equivalent of U.C.C. section 2-607(3)] is unreasonable as a matter of law where no explanation for the delay is provided and actual prejudice is sustained." 60 F.3d at 1098.

Aqualon asserts that, unlike the plaintiff in Hebron, it had good reasons for delay. The reasons it provides boil down to simply that Aqualon was slow in figuring out that it wanted to blame MAC for the cost over-run in designing its system.[4] Furthermore, Aqualon offers no explanation whatsoever for the delay of a year after filing its complaint against MAC before Aqualon served MAC with the complaint.

Aqualon also asserts that the delay was not unreasonable because MAC has not suffered any prejudice from the delay. MAC claims that there was prejudice to its case because of faded memories and lost documents, and gives an example of a lost document. Aqualon argues in rebuttal that the named document would have been irrelevant to MAC's case. We cannot tell whether the document would have been helpful because, it being lost, we cannot know exactly what information it contained. Furthermore, we cannot tell whether there may have been other pertinent documents available three years before MAC was served that were lost and have been forgotten during its period of repose. These considerations demonstrate why, although prejudice is relevant to whether a delay was reasonable, no showing of prejudice is required to make section 2-607(3) applicable.

III.

The district court correctly denied Aqualon's motion to remand the case and correctly dismissed Aqualon's contract and warranty claims because of Aqualon's failure to notify MAC of those claims within a reasonable time after accepting tender of the valves. The district court's judgment is

AFFIRMED.

_____

**4** MAC points out that Aqualon at first chose to blame C.W. Nofsinger, and prepared to file suit against it.

15