Per Curiam.
 

 Plaintiff appeals as of right from the trial court’s order granting summary disposition in favor of defendants under MCR 2.116(C)(10). We affirm.
 

 In April 1989, plaintiff entered into an agreement with the Ford Motor Company to manufacture the front bumpers for Ford F-series pickup trucks. According to plaintiff’s complaint, at all times Ford controlled the material specifications, processes, checking procedures, and finishes for the fasteners used in manufacturing the bumpers. Ford provided a list of approved sub-suppliers to plaintiff, which included defendants. From the suppliers of fasteners approved by Ford, plaintiff requested quotes for U-nuts that plaintiff would use to fasten the bumpers to the Ford bumper assemblies. In November 1990, the Palnut Company (first a division of defendant TRW, Inc., and later a division of defendant Trans-Technology Corporation) responded to plaintiff’s request by issuing a quotation for its U-nuts. In February 1991, plaintiff submitted a “blanket” purchase
 
 *342
 
 order, which allowed plaintiff to fill its need for U-nuts over the course of its contract with Ford.
 

 From 1991 to 1993, Palnut provided plaintiff with many U-nuts used in the bumper assemblies for Ford’s F-series pickup trucks. The U-nuts that were initially supplied to plaintiff had a phosphate-based coating. In 1992, in response to Ford’s requirements, Palnut changed the coating on the U-nuts to a zinc organic-based coating called Dorroflake. Late in 1992, plaintiff expressed concerns about Palnut’s slow delivery performance. In response, a Palnut employee suggested changing the fastener coating to Dacromet because that coating could be done in house. Dacromet is a zinc water-based coating manufactured by Metal Coatings International. Palnut sent samples of the Dacromet-coated U-nuts to plaintiff and in April 1993, plaintiff notified Palnut that the Dacromet-coated U-nuts were approved by its quality assurance department. Ford also approved Dacromet as a coating and in August 1993, Ford required that only Dacromet be used as a coating on the U-nuts and that Dorroflake was no longer an approved coating.
 

 In late November 1993, Ford received reports from its dealers that the U-nuts were failing, causing the bumpers to become loose or fall off the trucks. Ford relayed this information to plaintiff on November 28, 1993. Plaintiff then notified Palnut of the U-nut failure and on December 6, 1993, plaintiff canceled its contract with Palnut. In February 1994, Ford initiated a recall campaign to replace the defective U-nuts, an endeavor that cost Ford more than $9 million.
 

 On February 25, 1994, Ford issued a report, purportedly identifying what it believed to be the causes of the failure of the U-nuts. Ford believed that plain
 
 *343
 
 tiff and Palnut were at fault and that plaintiff should bear the financial responsibility because it was the end item supplier. Plaintiff and Palnut conducted independent investigations regarding why the U-nuts were failing. Ultimately, it was found that the cause of the failure was stress corrosion cracking. The U-nuts, which are made of high-strength steel, would crack or corrode when the zinc coating was exposed to a salt water environment (such as when roads are salted in the winter) and when the U-nuts are stressed (by inserting and tightening a bolt). One of the experts stated that it is “bad engineering” to put zinc on high-strength steel and that this was the cause of the U-nut failure.
 

 In June 1994, plaintiff presented its response to Ford’s report. In the response, plaintiff carefully dismissed each charge against it and Palnut and instead concluded that the root cause of the failure of the U-nuts was associated with the change to Dacromet from Dorroflake. Plaintiff clearly stated that the fault was with Ford and Metal Coatings International because Ford directed Palnut and all the approved fastener suppliers to change to Dacromet, but neither Ford nor Metal Coatings International had properly tested Dacromet when Ford directed this change.
 

 Nothing more happened between plaintiff and Pal-nut until plaintiff filed suit against defendants in August 1997. In the meantime, in 1995, Ford and plaintiff entered into settlement negotiations and an agreement was reached in May 1995. Plaintiff had initially paid $900,000 to Ford as part of the recall campaign, and also agreed to a one-time price reduction of $2.2 million. Palnut was not aware of or involved in the settlement negotiations.
 

 
 *344
 
 Plaintiffs amended complaint alleges breach of express warranty, breach of implied warranties of fitness and merchantability, express indemnification, and implied indemnification. Defendants moved for summary disposition, arguing that plaintiff failed to comply with the notice provision of subsection 2-607(3)(a) of the Uniform Commercial Code, MCL 440.2607(3)(a), requiring a buyer to notify a seller of a breach of contract within a reasonable time of discovering the breach, and that plaintiff was barred from any remedy. Defendants also argued that the breach of express warranty and express indemnification claims should be dismissed because the language in plaintiff’s purchase orders that supported those claims never became part of the parties’ contract. Finally, defendants argued that the implied indemnification claim should be dismissed because defendants were not given notice of, or an opportunity to participate in, the settlement negotiations between plaintiff and Ford. The trial court agreed and granted summary disposition under MCR 2.116(C)(10) in defendants’ favor “for the reasons set forth in the defendants’] brief and for the arguments made in court today.”
 

 The trial court’s ruling on a motion for summary disposition under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, is reviewed de novo.
 
 Maiden v Rozwood,
 
 461 Mich 109, 118, 120; 597 NW2d 817 (1999). The court is to consider the pleadings, affidavits, admissions, depositions, and other documentary evidence submitted by the parties in a light most favorable to the party opposing the motion.
 
 Id.
 
 at 120. If the proffered evidence fails to establish a
 
 *345
 
 genuine issue of material fact, the moving party is entitled to judgment as a matter of law.
 
 Id.
 

 This case involves application of the Uniform Commercial Code, MCL 440.1101
 
 et seq.
 
 Specifically, the trial court ruled that plaintiff had failed to give notice of breach of the contract to Palnut and, therefore, was barred from any remedy. MCL 440.2607(3)(a) provides:
 

 (3) Where a tender has been accepted
 

 (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]
 

 The burden of establishing a breach is on the buyer. MCL 440.2607(4). The parties disagree regarding whether there is a “strict” or “lenient” standard in Michigan relative to the adequacy of notice. Comment four to MCL 440.2607 states that the “content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched.” This sentence has been used to justify a lenient standard. Comment four, however, further states that “[t]he notification which saves the buyer’s rights . . . need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.” This sentence has been used to justify the strict standard.
 

 Regardless of whether a strict or lenient standard is applied, we find that the notice was not adequate in this case because the notice did not satisfy the policies underlying the ucc’s notice provision and plaintiff’s conduct did not satisfy the ucc’s standard of commercial good faith. See
 
 Aqualon Co v MAC
 
 
 *346
 

 Equipment, Inc,
 
 149 F3d 262, 268-269 (CA 4, 1998);
 
 Northern States Power Co v ITT Meyer Industries, 777
 
 F2d 405, 408, n 3 (CA 8, 1985);
 
 Eastern Airlines, Inc v McDonnell Douglas Corp,
 
 532 F2d 957, 976 (CA 5, 1976). Here, the undisputed facts are that Ford notified plaintiff in late November 1993 of the problems that Ford was experiencing with the U-nuts. Immediately thereafter, plaintiff informed Palnut that Ford was experiencing problems with the U-nuts. About one week later, plaintiff recommended, and Ford agreed, to change the fastener supplier from Pal-nut to California Industrial Products. On December 6, 1993, plaintiff notified Palnut that it would no longer purchase U-nuts from Palnut. Ford, plaintiff, and Pal-nut then began to investigate the problem to determine why the U-nuts were failing. Ford’s report was issued in February 1994. Ford assigned blame to plaintiff and Palnut, but believed that plaintiff should be assigned financial responsibility because it was the end item supplier. In June 1994, plaintiff responded to Ford’s conclusions with its own report exonerating itself and Palnut from responsibility for the failure of the U-nuts. Plaintiff’s report clearly assigned blame to Ford and Metal Coatings International. From March to May of 1995, Ford and plaintiff entered into settlement negotiations where plaintiff agreed to a settlement of $3.1 million and future price reductions to Ford totaling about $8 million. Palnut was not involved in any way in the settlement negotiations. It was not until August 1997 that plaintiff filed suit against defendants.
 

 The purposes of the ucc’s notice requirement are (1) to prevent surprise and allow the seller the opportunity to make recommendations how to cure the
 
 *347
 
 nonconformance, (2) to allow the seller the fair opportunity to investigate and prepare for litigation, (3) to open the way for settlement of claims through negotiation, and (4) to protect the seller from stale claims and provide certainty in contractual arrangements.
 
 Aqualon, supra
 
 at 269, citing 1 White & Summers, Uniform Commercial Code (4th ed), § 11-10, pp 612-613. Here, rather than allowing Palnut to attempt to cure the defect, plaintiff recommended purchasing the U-nuts from another manufacturer and simply canceled the contract. Once the parties investigated the problem with the U-nuts, plaintiff determined that Palnut was not at fault. Further, there was no overture of negotiation or settlement between plaintiff and Palnut. Indeed, there is no evidence that plaintiff ever considered Palnut to be in breach after the June 1994 report was presented to Ford. Ultimately, plaintiff did not bring suit against defendants until more than 3V2 years after the defect with the U-nuts was first discovered.
 

 We find that plaintiff has not presented a genuine issue of material fact that would preclude summary disposition for defendants. In this case, plaintiff did nothing more that initially notify defendants that there was a problem with the U-nuts, and never notified defendants that they were in breach. Some courts have made clear that it is not enough for the buyer to only notify the seller that it is having difficulty with the goods.
 
 Aqualon, supra
 
 at 266-267;
 
 K & M Joint Venture v Smith Int'l, Inc,
 
 669 F2d 1106, 1113 (CA 6, 1982). Clearly, plaintiffs conduct after the problem with the U-nuts was discovered is completely contrary to a finding that plaintiff considered defendants to be in breach because plaintiff’s own investigation
 
 *348
 
 exonerated defendants from fault.
 
 Eastern Airlines, supra
 
 at 978 (even if adequate notice is given at some point, subsequent actions by the buyer may negate its effect and the buyer’s conduct, taken as a whole, must constitute timely notification that the transaction is claimed to involve a breach). The purposes of the notice requirement were not served in this case; therefore, MCL 440.2607(3)(a) bars plaintiff from any remedy.
 

 To the extent that plaintiff argues that the “any remedy” language applies only to any remedy under the ucc and does not include its claims of express and implied indemnification, we disagree. MCL 440.1201(34) broadly defines “remedy” as “any remedial right to which an aggrieved party is entitled with or without resort to a tribunal.” Further, MCL 440.2607(3)(a) also clearly states that if notice of the breach is not given within a reasonable time, the buyer is “barred from any remedy.” It does not state “any remedy under the ucc” as plaintiff contends. Here, the statute plainly and unambiguously states that notice must be given or the buyer is barred from
 
 any
 
 remedy. Further, the indemnification claims here should be included as “any remedy” where the indemnification claims are based on the underlying breach of warranty claims for which the buyer also seeks a remedy.
 

 Accordingly, the trial court did not err in granting summary disposition in favor of defendants under MCR 2.116(C)(10) because plaintiff failed to give adequate notice under MCL 440.2607(3)(a) for the alleged breach, thus barring plaintiff from pursuing any remedy.
 

 Affirmed.